IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

Case No. 7:23-CV-00166-M

| | |
|---|---|
| BRENDA RANSOM,<br>*Administratrix of the Estate*<br>*of Stephen Kendrick Hunt*,<br><br>    Plaintiff,<br><br>v.<br><br>PAGE et al.,<br><br>    Defendants. | ORDER |

This matter comes before the court on Defendants Steven Gist, Sheriff Burnis Wilkins, the Robeson County Sheriff's Office ("RCSO"), and Western Surety Bonding Company's (the "Surety's") motion to dismiss [DE 57] and Defendants Robbie Edwin Page and Larry Dean Jones' motion to dismiss [DE 59]. For the reasons that follow, both motions are granted in part and denied in part.

## I.    PLAINTIFF'S ALLEGATIONS OF FACT

According to the Second Amended Complaint, Plaintiff is administratrix of the estate of Stephen Kendrick Hunt ("Hunt"). DE 56 at 1. Hunt was sentenced on state criminal charges and entered the custody of the RCSO on March 4, 2021. *Id.* at 3. While he was awaiting transfer to the state prison system, he was housed at the Robeson County Detention Center ("RCDC"), located in Lumberton, North Carolina. *Id.*

Hunt had a documented history of schizophrenia, substance abuse, seizures, attention deficit hyperactivity disorder, anxiety, depression, and suicide attempts. *Id.* at 4. In addition, his intake form for the RCDC reflected that he had previously overdosed on heroin. *Id.* After his

1

arrival at the RCDC, Hunt began suffering from apparent withdrawal; he was dehydrated, vomited repeatedly (including blood) and could not eat. *See id.* He was also placed in medical observation for several days due to heroin use. *Id.*

On March 9, Hunt was moved out of medical observation and into a booking cell located just six feet from an officer duty station. *Id.* This placement is known as administrative detention; Hunt had no cellmate. *See id.* Shortly after his placement in administrative detention, Hunt began banging on the door of his cell requesting help. *Id.* Defendant Gist was on duty nearby and, in an attempt to get Hunt to stop making noise, placed Hunt into full restraints (handcuffs, a waist chain, and leg irons). *Id.* Even with the restraints, Hunt continued to knock on the cell door with his foot, so Defendant Gist sprayed him with pepper spray and then left him in his cell without water "to detoxify." *Id.* at 4-5.

Some time later, Hunt was brought to the medical center at the RCDC and examined by medical staff for "seizure-like" activity. *Id.* at 5. Hunt told staff he was going through withdrawal. *Id.* No substance was indicated, and staff cleared Hunt to return to the general population. *Id.* But officers kept Hunt in administrative detention in the booking cell near their duty station. *Id.*

Early on the morning of March 10, Defendant Page reported for duty and was assigned to the booking area near Hunt's cell. *Id.* at 5. The facility was reportedly understaffed that day due to employee absences. *Id.* at 6. Shortly after reporting for the day, Defendant Page learned from other officers that Hunt was in administrative detention and had vomited "numerous times" overnight. *Id.* He also heard from medical staff that Hunt had been vomiting for days and was previously in observation for heroin use. *Id.*

After Defendant Page began his shift, he observed Hunt place his fingers in his throat to induce vomiting at 5:45 a.m., and again at 6:00 a.m.. *Id.* Hunt's cell had the odor of vomit and

feces, so Defendant Page took Hunt to the showers so he could get cleaned up. *Id.* He gave Hunt a new jumpsuit and then placed him in a different booking cell. *Id.*

Later that day, a social worker checked on Hunt. *Id.* Defendant Page was present to witness the interaction. *Id.* The social worker indicated that officers should not move Hunt if he "did not act right." *Id.*

Around 4:32 p.m. on the afternoon of March 10, Defendant Page opened Hunt's cell and placed a dinner tray on the floor. *Id.* at 7. He observed Hunt was covered in vomit and blood and appeared very weak. *Id.* But Defendant Page thought Hunt was faking his symptoms, so he did not request medical assistance for him. *See id.* Defendant Page closed the cell door. *Id.*

The RCSO has a written policy requiring officers to check on inmates in administrative detention twice per hour, with no more than 40 minutes lapsing between checks. *Id.* at 5. Instead of following that written policy, RCDC officers follow an unwritten policy of engaging in inadequate cell checks, where officers merely scan a barcode on the outside of each cell with a handheld scanner. *Id.* Officers do not open the cell door or look through the cell window to actually observe the inmate. *Id.*

Defendant Page did not conduct a proper check of Hunt's cell for at least the next hour. *See id.* at 8. He walked up to Hunt's cell and scanned the barcode on the outside, but did not look inside the cell. *Id.* Then, around 5:30 p.m., Defendant Jones began his shift. *Id.* Defendant Page told Defendant Jones that Hunt had been vomiting all day but was faking sick. *Id.* Between approximately 5:30 and 8:00 p.m., Defendant Jones conducted several improper checks of Hunt's cell by scanning the barcode on the outside but never actually looking into the cell to observe and document Hunt's status. *Id.*

3

Around 8:00 p.m., a nurse conducting rounds opened Hunt's cell window, and saw Hunt lying unresponsive on the floor of his cell. *Id.* at 9. The nurse asked Defendant Jones to open the cell door. *Id.* Defendant Jones did so, and when he and the nurse entered Hunt's cell, Hunt appeared lifeless, was cold to the touch, and apparent rigor mortis had set in. *Id.* There was a dark red "coffee ground like" substance all over Hunt and on the floor of his cell, consistent with Defendant Page's prior observation that Hunt had been vomiting blood. *See id.*

Defendant Jones immediately called medical responders, who arrived several minutes later. *Id.* Hunt was deceased and, according to medical staff, likely had been dead for 2-3 hours, placing his time of death between approximately 5:19 and 6:19 p.m. *See id.* at 10. Cell check logs reflect apparent checks of Hunt's cell at 6:42 p.m., 7:05 p.m. and 7:36 p.m., all of which would have occurred after Hunt's likely time of death. *Id.*

An autopsy revealed Hunt died of fentanyl toxicity. *Id.* The amount of fentanyl in his system at the time of the autopsy suggested recent ingestion. *Id.* Defendants Page and Jones were later criminally charged in connection with this event, and North Carolina's Department of Health and Human Services conducted an investigation, which found that RCDC officers were deficient in their cell checks on March 10. *Id.* at 11.

## II. PROCEDURAL HISTORY

Plaintiff initiated this federal action on February 23, 2023. DE 1. Two months later, Plaintiff filed an Amended Complaint. DE 22. Defendants Page and Jones then filed a motion to dismiss, and Defendants Gist, Wilkins, the RCSO and the Surety answered the Complaint and filed a motion for judgment on the pleadings. DE 26; DE 27; DE 28; DE 44; DE 45. Those motions were fully briefed, DE 38; DE 41; DE 49; DE 51, but at the same time Plaintiff sought leave of

court to file a Second Amended Complaint, which Defendants Page and Jones opposed, DE 36; DE 37; DE 42; DE 43.

The court ultimately granted Plaintiff leave to file a Second Amended Complaint, which she did. DE 55; DE 56. That pleading raises five federal and two state law claims against the various Defendants, including:

1. An excessive force claim against Defendant Gist for his use of pepper spray against Hunt;

2. A conditions of confinement claim against Defendants Page and Jones for leaving Hunt in an unsanitary cell on March 10;

3. A deliberate indifference claim against Defendants Page and Jones for their disregard of Hunt's medical needs on March 10;

4. A federal claim against Defendant Wilkins and his office for the unofficial policy of permitting improper cell checks at the RCDC;

5. A federal claim against Defendant Wilkins and his office for the unofficial policy of understaffing the RCDC;

6. A gross negligence claim against Defendant Wilkins and the Surety for the RCDC officers' failure to conduct proper cell checks on March 10; and

7. A wrongful death claim against Defendants Wilkins, Page, and Jones.

DE 56 at 11-17. Plaintiff also seeks punitive damages. *Id.* at 17-18.

Defendants Page and Jones filed a renewed motion to dismiss the Second Amended Complaint. DE 59; DE 60. In lieu of filing an answer, Defendants Gist, Wilkins, the RCSO and the Surety also filed a motion to dismiss. DE 57; DE 58. Both motions are now fully briefed and ready for decision. DE 64; DE 65; DE 66; DE 67; DE 68.

5

## III.  STANDARD OF REVIEW

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint; "it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."  *Republican Party of N. Carolina v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992).  As a result, the court accepts the complaint's factual allegations as true, and construes them in the light most favorable to the plaintiff.  *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009).

Although "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," the "allegations must be enough to raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  And importantly, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Likewise, "[l]abels, conclusions, recitation of a claim's elements, and naked assertions devoid of further factual enhancement will not suffice."  *ACA Fin. Guar. Corp. v. City of Buena Vista*, Virginia, 917 F.3d 206, 211 (4th Cir. 2019).  Ultimately, when considering a motion to dismiss, the court must "draw on its judicial experience and common sense" to determine whether the complaint "states a plausible claim for relief."  *Iqbal*, 556 U.S. at 679.

6

# IV. ANALYSIS

## a. Defendants Gist, Wilkins, the RCSO, and the Surety's Motion

### i. The RCSO

Defendants[1] first contend that all claims against the RCSO should be dismissed because a sheriff's office is not amenable to suit under 42 U.S.C. § 1983 or North Carolina law. DE 58 at 5-6. This contention is correct. "The capacity of a governmental body to be sued in the federal courts is governed by the law of the state in which the district court is held." *Avery v. Burke Cnty.*, 660 F.2d 111, 113–14 (4th Cir. 1981); Fed. R. Civ. P. 17(b)(3). North Carolina law "acknowledges that a *county* is a legal entity which may be sued." *Parker v. Bladen Cnty.*, 583 F. Supp. 2d 736, 740 (E.D.N.C. 2008) (referencing N.C.G.S. § 153A–11) (emphasis added). But "[n]o North Carolina statute authorizes suits against sheriffs' departments." *Grey v. Lamar*, No. 4:22-CV-00007, 2022 WL 3695482, at *3 (E.D.N.C. Aug. 25, 2022). Plaintiff's claims against the RCSO must therefore be dismissed because the RCSO lacks capacity to be sued. *See Efird v. Riley*, 342 F. Supp. 2d 413, 420 (M.D.N.C. 2004); Fed. R. Civ. P. 17(b)(3).

Even if state law authorized suits against the RCSO, here Plaintiff has already sued Defendant Wilkins in his official capacity as Sheriff of Robeson County, and a sheriff's office "is not a cognizable legal entity separate from the Sheriff in his official capacity." *Revene v. Charles Cnty. Comm'rs*, 882 F.2d 870, 874 (4th Cir. 1989). In other words, Plaintiff's federal claims against the RCSO are separately subject to dismissal because they are "duplicative" of his claims against Defendant Wilkins. *Love-Lane v. Martin*, 355 F.3d 766, 783 (4th Cir. 2004).

Notably, Plaintiff responded to Defendants' argument by conceding "that the claims against the RCSO are duplicative of those against Sheriff Wilkins in his official capacity." DE 65

---

[1] Although there are two groups of Defendants, and two motions to dismiss, for stylistic ease the court will refer to each group simply as "Defendants."

at 7. Plaintiff's concession is tantamount to an abandonment of her claims against the RCSO and warrants dismissal of those claims. *See Pueschel v. United States*, 369 F.3d 345, 354 (4th Cir. 2004); *Ferdinand–Davenport v. The Children's Guild*, 742 F.Supp.2d 772, 777 (D.Md. 2010). The court therefore grants Defendants' motion in part and dismisses Plaintiff's claims against the RCSO.

### ii. Excessive Force

Defendants next argue that the Second Amended Complaint fails to state a claim for excessive force against Defendant Gist for his use of pepper spray. DE 58 at 6. To recap the allegations relevant to that claim, Hunt was moved into a booking cell on the morning of March 9, and began banging on the door of his cell requesting help. DE 56 at 4. In an attempt to get Hunt to stop, Defendant Gist placed Hunt into full restraints. *Id.* But even with those restraints, Hunt continued to kick the cell door, so Defendant Gist sprayed him with pepper spray and then left him in his cell without water "to detoxify." *Id.* at 4-5. Those allegations plausibly give rise to a claim for excessive force.

"The Eighth Amendment prohibits the infliction of 'cruel and unusual punishments.'" *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996) (quoting U.S. CONST. amend. VIII). That term "has been interpreted in a flexible and dynamic manner." *Gregg v. Georgia*, 428 U.S. 153, 171 (1976). Thus, "the Eighth Amendment prohibits" more than just "physically barbarous" acts; it also forbids "the unnecessary and wanton infliction of pain," and punishments that "are grossly disproportionate to the severity of the crime." *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981) (internal quotation marks and citations omitted).

To state a claim for excessive force under the Eighth Amendment, a plaintiff must allege a "sufficiently serious" injury, *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008), caused by a prison

8

official[2] acting with a "sufficiently culpable state of mind," *Wilson v. Seiter*, 501 U.S. 294, 297 (1991). In assessing the plaintiff's injury and defendant's culpability, "the core judicial inquiry" centers on "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). This core judicial inquiry means that, although the plaintiff's injury is often relevant, the court's true focus is on the nature of the force used by the officer, and the justification for it. *See Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010) ("An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury.").

Turning first to Hunt's alleged injury, the test is an objective one; "[a]ll that is necessary is [an allegation] of more than *de minimis* pain or injury." *Williams*, 77 F.3d at 761 (italics in original). Phrased another way, although not "every malevolent touch by a prison guard gives rise to a federal cause of action," a plaintiff does *not* need to allege a "serious injury" to meet the objective component of an Eighth Amendment claim. *Hudson*, 503 U.S. at 9. "This is not a high bar." *Dean v. Jones*, 984 F.3d 295, 302 (4th Cir. 2021).

Defendants acknowledge that the Second Amended Complaint alleges more than a de minimis injury stemming from Defendant Gist's use of pepper spray. *See* DE 58 at 7. But Defendants reject Plaintiff's allegation that the pepper spray contributed to Hunt's death as "a conclusory statement," and accuse Plaintiff of providing no "supporting facts" for that conclusion.

---

[2] This case is somewhat unique because Hunt, after his conviction, qualified as a *prisoner* whose constitutional claims are analyzed under the Eighth Amendment, whereas Defendants Gist, Page, and Jones are officers employed at the RCDC, a jail which typically houses *pretrial detainees* whose claims are analyzed under the Due Process Clause of the Fourteenth Amendment. *See Bell v. Wolfish*, 441 U.S. 520, 535–36 (1979). This factual wrinkle is analytically immaterial though, because "[t]he due process rights of a pretrial detainee are at least as great as the eighth amendment protections available to the convicted prisoner. *Martin v. Gentile*, 849 F.2d 863, 870 (4th Cir. 1988). Accordingly, any reference to behavioral standards for "prison" officials applies equally to officers at a "jail" because a jail's officers must conform their conduct to the same (if not more strict) constitutional standards. *See id.* Put another way, the floor for their conduct is coextensive with that of a prison official.

DE 58 at 7. Defendants' accusation does not fairly consider the allegations in the Second Amended Complaint. Plaintiff alleges that Defendant Gist (1) administered pepper spray to Hunt when he was fully restrained (and thus could not cover his eyes, nose, or mouth), (2) left Hunt in his cell to detoxify with no water, that shortly thereafter Hunt (3) suffered from an apparent seizure, (4) was seen by medical staff and cleared, but (5) vomited throughout the night, and (6) died the next day. DE 56 at 4-7, 9-10. Because the court must construe those factual allegations in the light most favorable to Plaintiff and draw every reasonable inference in her favor, the court cannot dismiss the link between Defendant Gist's pepper spray and Hunt's death as merely "a conclusory statement." DE 58 at 7.

The *Iko* case from the Fourth Circuit is instructive. There, at summary judgment, a medical report in the record "suggested that [an officer's use of] pepper spray *may have* contributed to Iko's asphyxia and death." *Iko*, 535 F.3d at 239 (emphasis added). Because the Court had to accept, for purposes of summary judgment, "that Plaintiffs might be able to prove that Iko's death resulted from the excessive use of pepper spray," the Fourth Circuit "easily conclude[d] that Plaintiffs satisf[ied] the objective component of their excessive force claim at th[at] stage in the litigation." *Id.* Likewise here, because the court must accept as true the factual allegations linking Defendant Gist's use of pepper spray and Hunt's death, it similarly concludes that Plaintiff satisfies the objective component of her excessive force claim at this stage of the litigation.

Moreover, even if the court were to disregard the allegation that Defendant Gist's use of pepper spray "likely facilitated" Hunt's death, DE 56 at 12, the Complaint also alleges that Hunt was left in his cell without water after Defendant Gist pepper sprayed him, and shortly thereafter experienced "seizure-like activity," *id.* at 5. The court finds that being left in a confined space without water after an officer has administered pepper spray and then suffering from an apparent

seizure clears the "not [] high bar," *Dean*, 984 F.3d at 302, of "more than *de minimis* injury," *Williams*, 77 F.3d at 761. That's just "common sense." *Iqbal*, 556 U.S. at 679; *see also Dean*, 984 F.3d at 303 (expressing that Fourth Circuit had "no difficulty concluding . . . that a sustained blast of pepper spray directly to the face constitutes something more than de minimis force"); *Williams*, 77 F.3d at 763 (noting that mace "possess[es] inherently dangerous characteristics capable of causing serious and perhaps irreparable injury to the victim").

In that regard, this action bears relevant similarity to the *Robinson* case from the District of South Carolina. In that case, the plaintiff alleged that, while a prisoner in the custody of the South Carolina prison system, he requested medical assistance from a guard because "he was vomiting and his throat was constricted." *Robinson v. S.C. Dep't of Corr.*, No. C.A. 4:10-157, 2011 WL 1770817, at *1 (D.S.C. May 10, 2011). The guard denied the request, so the plaintiff's "cell mate began kicking their cell door in an attempt to secure medical attention for [the plaintiff]." *Id.* at *4. When the guard returned to the cell, the plaintiff again requested medical assistance (while employing derogatory language), and the guard sprayed the plaintiff with pepper spray and left him in his cell. *Id.* The plaintiff was later admitted to a medical center and "diagnosed with sarcoidosis." *Id.* at *1. The *Robinson* Court found that, based on that version of events, a jury could conclude that the guard subjected the plaintiff to excessive force in violation of the Eighth Amendment. *See id.* at *4. That finding operates with equal force in this action, where Hunt was also in full restraints and there is no allegation that he made offensive remarks to Defendant Gist. *See* DE 56 at 4-5.

The court's conclusion on the objective component of Plaintiff's excessive force claim is also supported by *Hudson*, where the Supreme Court recognized that "[t]he objective component of an Eighth Amendment claim is [] contextual and responsive to contemporary standards of

decency." *Hudson*, 503 U.S. at 8 (internal quotation marks omitted). Even though Hunt was later attended to by medical staff and ultimately cleared to return to the general population, DE 56 at 5, the Fourth Circuit has "specifically recognized that the objective component can be met by the pain itself, even if an inmate has no enduring injury," *Williams*, 77 F.3d at 762 (internal quotation marks and citation omitted). The court can reasonably infer that Hunt suffered from more than de minimis pain when Defendant Gist left him in his cell "to detoxify" without water and he then had an apparent seizure. DE 56 at 5. The Second Amended Complaint plausibly alleges the objective component of an Eighth Amendment excessive force claim.

Fighting this conclusion, Defendants offer five unpublished cases for the proposition "that temporary pain caused by the use of chemical agents do [sic] not cause more than de minimis pain or injury where the inmate is promptly provided with medical care or an adequate opportunity to rinse the chemicals from his person." DE 58 at 7 (collecting cases) (internal quotation mark omitted). But those cases are inapposite. Hunt was not promptly provided with medical care; Defendant Gist left him in his cell without water "to detoxify." DE 56 at 5.

In addition, the cases that Defendants collected as support all predate *Wilkins*, where in 2010 the Supreme Court admonished the Fourth Circuit for "stray[ing] from the clear holding of [the Supreme] Court in *Hudson*," by reinstating a requirement of "what amounts to a showing of significant injury in order to state an excessive force claim." *Wilkins*, 559 U.S. at 36. The Fourth Circuit's "strained reading of *Hudson*" was, in the Supreme Court's view, "not defensible." *Id.* at 40. Thus, this court does not find persuasive the holdings of those Fourth Circuit (and district court in the Fourth Circuit) cases, which impermissibly refocused "the core judicial inquiry" away from "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm," and towards "some arbitrary quantity of injury."

12

*Hudson*, 503 U.S. at 7 & 9. The portions of those cases Defendants rely upon are also no longer good law. *See Dean*, 984 F.3d at 303 (recognizing that focus on whether plaintiff suffered de minimis injury "is the wrong question," and "what matters is the severity of the *force* employed," and further finding that "sustained blast of pepper spray directly to the face constitutes something more than de minimis force") (emphasis in original). This court adheres to *Hudson*, *Wilkins*, and *Dean* in finding the objective component met.

Turning next to "[t]he more demanding part of the test," "the subjective component," the court's inquiry trains on "whether [Defendant Gist allegedly] acted with a 'sufficiently culpable state of mind.'" *Dean*, 984 F.3d at 302 (quoting *Williams*, 77 F.3d at 761). "The Supreme Court has set forth four non-exclusive factors to assist courts in assessing whether an officer has acted" with a sufficiently culpable state of mind. *Iko*, 535 F.3d at 239. Those factors include (1) "the need for the application of force," (2) "the relationship between the need and the amount of force that was used," (3) "the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them," and (4) "any efforts made to temper the severity of a forceful response." *Whitley v. Albers*, 475 U.S. 312, 321 (1986). In the current procedural posture, each factor favors Plaintiff and a finding that Defendant Gist acted with a sufficiently culpable state of mind.

First, accepting as true Plaintiff's allegations, there was no apparent need to apply force. Hunt was knocking on the door of his cell requesting help. DE 56 at 4. Instead of inquiring as to why Hunt needed help, Defendant Gist placed him in full restraints. *Id.* Hunt continued to kick the cell door, so Defendant Gist pepper sprayed him. *Id.*

A prisoner making noise in an attempt to seek help from a nearby guard is not the sort of "recalcitrant inmate" for whom "mace can be constitutionally used in small quantities." *Williams*,

13

77 F.3d at 763; *see also Iko*, 535 F.3d at 239 (holding that "some dispersal of pepper spray was warranted" in order to "carry[] out" cell extraction of inmate who refused to leave cell). In addition, it bears repeating that Hunt was in full restraints. "[T]he use of pepper spray on a docile prisoner [can] qualify as excessive force," and even if Hunt's kicking of the door had been aggravating to Defendant Gist, "the Eighth Amendment does not permit a correctional officer to respond to a misbehaving inmate" by using retaliatory force where the inmate is physically restrained. *Boone v. Stallings*, 583 F. App'x 174, 176 (4th Cir. 2014); *see also Brooks v. Johnson*, 924 F.3d 104, 113 (4th Cir. 2019) (noting that correctional officer may constitutionally "inflict [some quantum of] pain [] to induce compliance, but [not] to punish an inmate for intransigence or to retaliate for insubordination"); *Landman v. Royster*, 333 F. Supp. 621, 649 (E.D. Va. 1971) (recognizing that "the use of gas to disable a man physically who poses no present physical threat constitutes a form of corporal punishment, the use of which in such a situation is generally disapproved").

Furthermore, there is no allegation that Defendant Gist instructed Hunt to stop kicking the door prior to administering pepper spray. Rather here, "[w]ithout being instructed to cease his conduct, Plaintiff states that Defendant [Gist] immediately [opened the cell door] and sprayed [Hunt] with [pepper] spray." *Douty v. Rubenstein*, No. 2:13-CV-32832, 2016 WL 11481145, at *12 (S.D.W. Va. Apr. 27, 2016) (recommending that excessive force claim proceed to trial), *recommendation adopted*, No. 2:13-CV-32832, 2016 WL 3349325 (S.D.W. Va. June 15, 2016). "Eighth Amendment violations have [] been found when a chemical agent was used without a prior verbal command." *Glascoe v. Sowers*, No. 11-CV-2228, 2013 WL 5330503, at *6 (D. Md. Sept. 20, 2013) (collecting cases), *aff'd*, 570 F. App'x 344 (4th Cir. 2014). Because Hunt was requesting help, in full restraints and inside of a locked cell, the court cannot conceive of any basis for the

14

application of force other than to quiet Hunt. But absent any allegation of a prior verbal command, the court finds no need for Defendant Gist's use of pepper spray (at the time he used it).[3]

Next, and relatedly, the court considers "the relationship between the need and the amount of force that was used." *Whitley*, 475 U.S. at 321. Where, as here, the court discerns no need for force, the relationship between that (nonexistent) need and the amount of force Defendant Gist used necessarily skews in Plaintiff's favor. *See Thompson v. Commonwealth of Virginia*, 878 F.3d 89, 100 (4th Cir. 2017) (holding that if "there was never a need, the use of force [would be] disproportionate from start to finish"); *Tedder v. Johnson*, 527 F. App'x 269, 273 (4th Cir. 2013) (recognizing that where court concludes "that no force was necessary at all, the *Whitley* "amount of force" factor favors [the plaintiff] as well"). In addition, the Fourth Circuit has found that the use of pepper spray "after [a prisoner has] attempted to comply with orders . . . tend[s] to show that the amount of force was disproportionate to the need for force." *Iko*, 535 F.3d at 240. Because there is no allegation that Defendant Gist issued any order to Hunt, Hunt had no opportunity to comply, and thus the court finds that the resulting use of pepper spray was disproportionate to its need.

Third, there was no "threat to the safety of staff and inmates." *Whitley*, 475 U.S. at 321. At the risk of stating the obvious, Hunt was in handcuffs, a waist chain, and leg irons, inside of a locked cell. DE 56 at 4. The Fourth Circuit has (repeatedly) held that a restrained prisoner does not pose a threat to officers or others. *E.g.*, *Dean*, 984 F.3d at 304; *Iko*, 535 F.3d at 240; *Boone*, 583 F. App'x at 177. Where a prisoner is "fully restrained with shackles, handcuffs, and a black box," officers "cannot[] argue" that the prisoner "present[s] any kind of physical threat."

---

[3] Because the Complaint does not allege that Defendant Gist issued a prior verbal command to Hunt, Defendants' description of Hunt as a "recalcitrant inmate" is misguided. DE 58 at 10; *see also Recalcitrant*, DICTIONARY.COM, https://www.dictionary.com/browse/recalcitrant (defining "recalcitrant" as one who is "resisting authority or control; not obedient or compliant") (last visited Jan. 8, 2025).

15

*Thompson*, 878 F.3d at 100. Defendants suggest that "[i]t is unclear which party the third [*Whitley*] factor would favor," DE 58 at 10, but it's not. Based on the allegations in the Second Amended Complaint, that factor favors Plaintiff.

Lastly, there were no apparent "efforts made to temper the severity of a forceful response." *Whitley*, 475 U.S. at 321. There is no allegation that Defendant Gist issued Hunt a verbal command prior to administering pepper spray, and after he sprayed Hunt, he left him in the cell with no water. DE 56 at 4-5. Leaving a prisoner in a confined space without medical care after the administration of a chemical agent reflects an absence of effort to temper the severity of a forceful response. *See Iko*, 535 F.3d at 240. In sum, each *Whitley* factor favors Plaintiff, and the court finds that the allegations in Second Amended Complaint plausibly permit the inference that Defendant Gist acted with "a sufficiently culpable state of mind." *Wilson*, 501 U.S. at 297. Plaintiff has therefore stated a claim for excessive force in violation of the Eighth Amendment.

### iii. Qualified Immunity

Defendants further argue that "[e]ven if Defendant Gist violated Hunt's Federal Constitutional rights, . . . he is still entitled to qualified immunity." DE 58 at 11. Given the current procedural posture, this argument is without merit.[4] To start, the court observes that "the Eighth Amendment prohibits only intentional conduct," *Thorpe v. Clarke*, 37 F.4th 926, 934 (4th Cir. 2022), and qualified immunity does not shield "those who knowingly violate the law," *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). Thus, the very nature of Plaintiff's Eighth Amendment claim, for which Defendant Gist's "mental state remains genuinely in issue," precludes his entitlement to qualified immunity at the motion to dismiss stage. *Thorpe*, 37 F.4th at 934; *see also King v.*

---

[4] Defendants frame the pertinent test as whether an officer may "use pepper spray, in some quantity, in order to get an inmate to comply with a lawful request." *Id.* But that sanitized version of events does not reflect the Second Amended Complaint's well-pleaded allegations, which contain no indication of a lawful request from Defendant Gist to Hunt. *See* DE 56 at 4-5.

16

*Blackwood*, No. 1:21-CV-383, 2023 WL 4163141, at *8 (M.D.N.C. June 23, 2023), *recommendation adopted*, No. 1:21-CV-383, 2023 WL 4902517 (M.D.N.C. Aug. 1, 2023); *Pevia v. Moyer*, No. 20-CV-3270, 2023 WL 3740562, at *8 (D. Md. May 30, 2023).

Even if the court conducted a full qualified immunity analysis, the result would be no different. A defendant is not entitled to qualified immunity at the motion to dismiss stage if the plaintiff has plausibly alleged that the defendant violated a constitutional right that was clearly established at the time of the violation. *See Hope v. Pelzer*, 536 U.S. 730, 736 (2002); *Estate of Armstrong ex rel. Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 898 (4th Cir. 2016). The court has already concluded that Plaintiff plausibly alleged a violation of the Eighth Amendment, so all that remains is assessment of whether Hunt's right to be free from Defendant Gist's excessive use of force was clearly established in March of 2021.

According to the Second Amended Complaint, Defendant Gist (without warning) pepper sprayed a prisoner who was fully restrained inside of a locked cell because that prisoner was kicking the door seeking the help of an officer. *See* DE 56 at 4-5. If that is what happened (and the court must consider as much at this stage), that conduct is so inconsistent with the Eighth Amendment's prohibition on cruel and unusual punishments that any "reasonable officer would have understood that what he was doing was unlawful, whether by then-existing precedent or by the otherwise obvious illegality of that outrageous conduct." *Martin v. Short*, No. 23-1588, 2024 WL 3200715, at *4 (4th Cir. June 27, 2024); *see also Hope*, 536 U.S. at 736 (explaining that if officer's conduct "so obvious[ly]" violates Eighth Amendment, he is not entitled to qualified immunity even without "fundamentally similar" prior case); *Whitley*, 475 U.S. at 321.

Putting aside the obvious illegality of Defendant Gist's (alleged) conduct, that conduct also violated clearly established law. *See Estate of Armstrong*, 810 F.3d at 898. As the Fourth Circuit

17

held in *Thompson*, after summarizing over 25 cases from the Supreme Court and Circuit Courts of Appeals:

> [It] is apparent from the case law [that] the Eighth Amendment protection against the malicious and sadistic infliction of pain and suffering applies in a diverse range of factual scenarios. That unifying thread provides fair notice to prison officials that they cannot, no matter their creativity, maliciously harm a prisoner on a whim or for reasons unrelated to the government's interest in maintaining order. *That principle applies with particular clarity to cases . . . where the victim is restrained, compliant, and incapable of resisting or protecting himself, and otherwise presents no physical threat in any way.*

*Thompson*, 878 F.3d at 105 (emphasis added). In other words, it has been clearly established in the Fourth Circuit, for decades, "that a correctional officer uses excessive force" by applying force to a restrained prisoner who poses no threat to officer safety. *Dean*, 984 F.3d at 310. At this stage of the litigation, Defendant Gist cannot show an entitlement to qualified immunity.

### iv. *Monell* – Understaffing Policy

Defendants next target the allegation that Defendant Wilkins had a policy of understaffing the RCDC and argue that Plaintiff fails to state a claim upon which relief may be granted. DE 58 at 14. The relevant allegations include that, when Defendant Page arrived for work on the morning of March 10, "the RCDC was busy and understaffed because of five missing RCSO employees," that Defendant Jones "assigned himself to cell check duty in the booking area because the [RCDC] was busy and understaffed," and that Defendant "Wilkins knew or had reason to know that the RCDC was short-staffed and failed to secure appropriate staffing to ensure the health and safety of detainees and recent convicts awaiting assignment to a state institution." DE 56 at 6, 8, 15. These allegations do not state a plausible claim for relief.

Because Plaintiff named Defendant Wilkins in his official capacity as Sheriff of Robeson County, her claims against him are, in essence, claims against his office. *Simmons v. Corizon Health, Inc.*, 122 F. Supp. 3d 255, 267 (M.D.N.C. 2015). For his office to be liable under Section

1983, "Plaintiff must allege that the alleged constitutional violations resulted from an official policy or custom of the Sheriff's office." *Evans v. Guilford Cnty. Det. Ctr.*, No. 1:13-CV-499, 2014 WL 4641150, at *3 (M.D.N.C. Sept. 16, 2014). This is so because, although "local government units" are "included among those persons to whom § 1983 applies," they may not "be held liable" under that statute "unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690-91 (1978). In that regard, Defendant Wilkins "cannot be held liable *solely* because [he] employ[ed] a tortfeasor," i.e., "under [] a *respondeat superior* theory." *Id.* at 691 (italics in original).

"A policy or custom for which a [government unit] may be held liable can arise in four ways: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that manifests deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law." *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (cleaned up). Plaintiff proceeds under the fourth theory, alleging that understaffing at the RCDC was so persistent and widespread that Defendant Wilkins knew (or should have known) about it, and yet he "failed to secure appropriate staffing to ensure the health and safety of detainees and recent convicts awaiting assignment to a state institution." DE 56 at 15. "Prevailing under such a theory is no easy task," and a plaintiff attempting to do so must at least allege a practice of sufficient "duration and frequency" such that the policymaker of the office "had actual or constructive notice of the conduct" and "failed to correct it due to [] deliberate indifference." *Owens v. Baltimore City State's Att'ys Off.*, 767 F.3d 379, 402 (4th Cir. 2014) (internal quotation mark omitted).

Plaintiff alleges that, for a period of several days, the RCDC was understaffed and Defendant Wilkins, knew, or should have known, about the understaffing. DE 56 at 15. Allegations about what occurred over a span of days are the sort of "[s]poradic or isolated" instances that "will not give rise to *Monell* liability." *Owens*, 767 F.3d at 403; *see also Connick v. Thompson*, 563 U.S. 51, 63 n.7 (2011) (explaining that "contemporaneous [] conduct cannot establish a pattern of violations that would provide notice to the [policymaker] and the opportunity to conform to constitutional dictates") (internal brackets and quotation marks omitted); *Rodwell v. Wicomico Cnty., Maryland*, No. 22-CV-3014, 2024 WL 1178202, at *14 (D. Md. Mar. 19, 2024) (holding that "three examples do not indicate a 'persistent and widespread practice'") (quoting *Owens*, 767 F.3d at 402); *Peters v. Cmty. Educ. Centers, Inc.*, No. 11-CV-850, 2014 WL 981557, at *7 (E.D. Pa. Mar. 13, 2014) (finding that "objectionable behavior that occurs . . . over the course of fifteen days" constituted a single incident and was "insufficient to put a municipality on notice of the existence of a widespread custom").

At a minimum, Plaintiff needed to plausibly allege that understaffing at the RCDC was "widespread, or at least [occurred] on several different occasions." *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994). She has not done so. As a result, Plaintiff's allegation, standing alone, does not permit the inference that understaffing was a "persistent and widespread" practice, *Lytle*, 326 F.3d at 471, about which Defendant Wilkins could be said to have "actual or constructive notice," *Owens*, 767 F.3d at 402.

Moreover, the only non-conclusory factual allegation related to understaffing actually undercuts Plaintiff's theory that understaffing was the result of a de facto policy attributable to Defendant Wilkins. According to the Second Amended Complaint, when Defendant Page arrived for work on the morning of March 10, "the RCDC was busy and understaffed *because of five*

*missing RCSO employees*." DE 56 at 6 (emphasis added). Thus, per Plaintiff, the RCDC was understaffed not because Defendant Wilkins had a policy of understaffing the facility, but because employees did not show up for work. If understaffing at the RCDC only occurred due to employee absences, then the most reasonable inference is that Defendant Wilkins had a policy of adequately staffing the RCDC, and employees violated that policy by failing to report for work. But Defendant Wilkins cannot be held liable in his official capacity for those failures because there is no respondeat superior liability under Section 1983. *See Monell*, 436 U.S. at 691.[5]

Plaintiff's *Monell* claim is separately and independently subject to dismissal because the Second Amended Complaint does not draw a plausible causal link between understaffing at the RCDC and Hunt's death. Plaintiff alleges that, on the evening of March 10, Defendant Jones "assigned himself to cell check duty in the booking area," and then "did not conduct proper cell checks" of Hunt's cell from approximately 5:30 – 8:00 p.m. DE 56 at 8. Defendant Jones did not conduct appropriate cell checks due to an alleged unwritten policy at the RCDC whereby officers would "not open cell doors or windows or have direct communication with inmates" and instead "only used a handheld scanner to scan the cell codes located outside of each cell." *Id.* at 5. In other words, the lack of supervision of Hunt on the evening of March 10 had nothing to do with understaffing at the RCDC.

To ensure that a government unit "is not held liable solely for the actions of its employee," *Monell* claims entail "rigorous standards of culpability and causation." *Board of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 405 (1997). As such, a pleading "must [draw] a direct causal link between the action and the deprivation of federal rights." *Morgan v. City of*

---

[5] Alternatively, to the extent Plaintiff intended to frame her *Monell* theory as "an omission . . . that manifests deliberate indifference to the rights of citizens," *Lytle v. Doyle*, 326 F.3d at 471, it would fail for the same reason. The RCDC was not short-staffed due to an omission attributable to Defendant Wilkins, i.e., a failure to assign enough officers to work at the facility. The RCDC was short-staffed because of "missing RCSO employees." DE 56 at 5-6.

21

*Charlotte*, No. 3:22-CV-00003, 2023 WL 4002524, at *12 (W.D.N.C. June 14, 2023). With that rigorous standard in mind, the Second Amended Complaint fails to connect the dots between understaffing and Hunt's death. On the evening of March 10, Defendant Jones was already assigned to the booking area near Hunt, and he conducted inadequate checks of Hunt's cell due to an alleged unwritten policy amongst officers, *not* because the facility was short-staffed. DE 56 at 8. Thus, the hypothetical presence of additional staff on the evening of March 10 would not have had any apparent effect on the custody and care of Hunt. *See Gordon v. Kidd*, 971 F.2d 1087, 1097 (4th Cir. 1992) (holding that plaintiff must show that, had complained-of policy been different, his "injury would have been avoided"). Because Plaintiff has failed to allege a policy or custom fairly attributable to Defendant Wilkins, and further failed to draw a causal connection between the alleged violation and Hunt's injury, the court grants Defendants' motion to dismiss in part with regard to Plaintiff's *Monell* understaffing claim.

### v.  *Monell – Cell Check Policy*

Defendants also seek dismissal of Plaintiff's *Monell* claim targeting the "unwritten policy [] that deputies [would] not conduct appropriate cell checks" by "only us[ing] a handheld scanner to scan the cell codes located outside of each cell" instead of opening the cell door or looking through the cell window to observe the status of the inmate. DE 56 at 5; DE 58 at 15. Pertinent to that allegation, Defendant Page failed to conduct proper cell checks on March 10, and later reported that he "failed to conduct proper cell checks because he was too busy," even though "video surveillance demonstrates that [he] was not busy and was sitting in the booking area interacting with other deputies." *Id.* at 7; *see also id.* at 8. In addition, Defendant Jones failed to "conduct proper cell checks" on March 10 between approximately 5:00 – 8:00 p.m. *Id.* at 8; *see also id.* at 10. Plaintiff alleges that Defendant "Wilkins knew or had reason to know that [] officers

22

were not conducting proper [] cell checks" because their conduct was "recorded by RCD[C] video surveillance and correctional officer statements." *Id.* at 15.

These allegations, like those related to the policy of understaffing, fail to state a *Monell* claim. As an initial matter, the court emphasizes that this alleged "unwritten policy" directly violated an express policy promulgated by Defendant Wilkins. DE 56 at 5 ("RCSO and RCDC written policies and procedures required RSCO deputies to perform cell checks on inmates twice per hour."). Therefore, Plaintiff must allege that officers acted pursuant their own unwritten policy in such a "persistent and widespread" manner, *Lytle*, 326 F.3d at 471, that Defendant Wilkins must have had "actual or constructive notice" of their noncompliance with his express policy for cell checks, *Owens*, 767 F.3d at 402.

Plaintiff has not identified persistent and widespread conduct. She alleges that Defendants Page and Jones conducted improper cell checks on March 10, and that their conduct that day reflected unofficial RCDC policy. DE 56 at 5, 7-8. But, as previously explained, an "isolated" example of unconstitutional conduct does "not give rise to *Monell* liability," *Owens*, 767 F.3d at 403, and "Plaintiff must do more than allege in a conclusory fashion that the [Sheriff's Office] maintains an unwritten policy or custom of permitting the types of wrongs [Hunt] experienced." *Segura v. City of La Mesa*, 647 F. Supp. 3d 926, 936 (S.D. Cal. 2022) (collecting cases).

Relatedly, the Second Amended Complaint does not allege a practice of sufficient "duration and frequency" that would permit the inference that Defendant Wilkins had "actual or constructive notice of [it]." *Owens*, 767 F.3d at 402. Plaintiff alleges that Defendant "Wilkins knew or had reason to know that [] officers were not conducting proper [] cell checks" because their conduct was "recorded by RCD[C] video surveillance and correctional officer statements." DE 56 at 15. But the only surveillance footage referenced by Plaintiff was captured on March 10,

23

and any correctional officer statements would have been provided during investigations that post-date Hunt's death. DE 56 at 7-8. As the Supreme Court explained in *Connick*, "contemporaneous or subsequent conduct cannot establish a pattern of violations that would provide notice to the [policymaker]" because in those circumstances the conduct provides no "opportunity [for the policymaker] to conform to constitutional dictates." *Connick*, 563 U.S. at 63 n.7. Plaintiff's allegations therefore do not permit the inference that Defendant Wilkins was on notice of the RCDC's unofficial policy and failed to correct it due to deliberate indifference.

In opposition to Defendants' motion, Plaintiff cites *Jordan by Jordan* for the proposition that a plaintiff is not required to "plead multiple instances of similar constitutional violations to support an allegation of municipal policy or custom." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 339 (4th Cir. 1994). But *Jordan by Jordan* "pre-date[d] *Twombly* and *Iqbal*, the controlling cases on the requisite pleading standard under Rule 8(a) of the Federal Rules of Civil Procedure," which now establish "that a [p]laintiff must plead a plausible claim for relief, and not merely recite conclusory allegations devoid of any factual support." *Taylor v. Somerset Cnty. Commissioners*, No. 16-CV-0336, 2016 WL 3906641, at *10 (D. Md. July 19, 2016). The Fourth Circuit has since observed that *Jordan by Jordan* no longer controls evaluation of *Monell* claims at the pleading stage. *See Cook v. Howard*, 484 F. App'x 805, 810–11 (4th Cir. 2012). Accordingly, Plaintiff must allege sufficient factual matter regarding a persistent and widespread practice that plausibly permits the inference that Defendant Wilkins had actual or constructive notice of the practice. *Lytle*, 326 F.3d at 471; *Owens*, 767 F.3d at 402. By only alleging facts related to that practice on March 10 (and thereafter) Plaintiff has not satisfied her pleading burden. *See Connick*, 563 U.S. at 63 n.7. The court grants Defendants' motion to dismiss in part with regard to Plaintiff's cell-check *Monell* claim.

vi. <u>Wrongful Death and Gross Negligence</u>

Defendants next contend that Plaintiff's claims against Defendant Wilkins for gross negligence and wrongful death are barred by governmental immunity. DE 58 at 16. In response, Plaintiff asserts that Defendant Wilkins waived governmental immunity by purchasing a sheriff's bond. DE 65 at 21-22. Defendants did not attempt to rebut this assertion in their reply, *see* DE 67 at 1-9, and the court finds merit in Plaintiff's position.

"Generally, governmental immunity protects a municipality and its officers or employees sued in their official capacity for torts committed while performing a governmental function." *Sellers v. Rodriguez*, 149 N.C. App. 619, 623, 561 S.E.2d 336, 339 (2002). Even so, "a sheriff may [] waive governmental immunity by purchasing a bond." *Id.* at 624, 339. Specifically, "Section 58-76-5 of the North Carolina General Statutes provides a limited waiver of sovereign immunity for certain officials covered by statutory bonds." *Wynn v. Frederick*, 385 N.C. 576, 581, 895 S.E.2d 371, 376 (2023), *reh'g denied*, 896 S.E.2d 254 (N.C. 2024).

Sheriffs are specifically enumerated in Section 58-76-5, and Plaintiff "allege[d] waiver through the surety." *Efird*, 342 F. Supp. 2d at 426; *see also* DE 56 at 3. Plaintiff also "joined [the Surety] as a party to the action." *Sellers*, 149 N.C. App. at 624, 561 S.E.2d at 339. The court therefore finds "that Plaintiff has sufficiently alleged waiver of immunity," *Efird*, 342 F. Supp. 2d at 426, and denies Defendants' motion as it pertains to governmental immunity.

vii. <u>Punitive Damages</u>

Lastly, Defendants argue that Plaintiff cannot recover punitive damages against Defendant Wilkins because the Second Amended Complaint does not plausibly allege that he acted with malice, willfully, or wantonly. DE 58 at 17. Defendants also contend that punitive damages are unavailable against Defendant Gist because the Second Amended Complaint docs not allege

25

reckless or callous indifference on his part. *Id.* at 18. Plaintiff responded to both arguments. DE 65 at 22-24.

First, as to Defendant Gist, "punitive damages are available [under Section 1983] for conduct that involves reckless or callous indifference to the federally protected rights of others." *Martin v. Seabolt*, No. 1:21-CV-906, 2023 WL 3074718, at *22 (M.D.N.C. Apr. 25, 2023) (cleaned up) (quoting *Cooper v. Dyke*, 814 F.2d 941, 948 (4th Cir. 1987)), *aff'd sub nom. Martin v. Short*, No. 23-1588, 2024 WL 3200715 (4th Cir. June 27, 2024). Defendants' single, conclusory sentence that "Plaintiff has failed to allege any facts to plausibly support a claim of any evil motive or intent on the part of Defendant Gist" does not persuade the court. DE 58 at 24. In fact, the court's prior finding that Plaintiff plausibly stated a claim for excessive force against Defendant Gist necessarily means that punitive damages remain available from him; "[t]he callous indifference required for punitive damages is essentially the same as the deliberate indifference required for a finding of liability on the § 1983 claim." *Cooper*, 814 F.2d at 948; *see also Wilson*, 501 U.S. at 297 (analogizing deliberate indifference and wanton infliction of pain for purpose of Eighth Amendment claim). Further, and as previously summarized, Plaintiff alleges that Defendant Gist (without warning) pepper sprayed a prisoner who was fully restrained inside of a locked cell because that prisoner was kicking the door seeking the help of an officer, and then left the prisoner in the cell without water instead of providing him with medical assistance. *See* DE 56 at 4-5. That conduct, if true, plainly violates the Eighth Amendment and reflects callous indifference to Hunt's rights. *See Thompson*, 878 F.3d at 105; *Dean*, 984 F.3d at 310. At this early stage of the proceedings, punitive damages remain available from Defendant Gist.

As for Defendant Wilkins, the court finds that punitive damages are not available, albeit not on the basis proffered by Defendants.[6] Plaintiff has only sued Defendant Wilkins in his official capacity. *See* DE 56 at 1 (case caption reflecting naming of Defendant "Robeson County Sheriff Burnis Wilkins in his Official Capacity"). A suit against a sheriff in his official capacity "is in fact a suit against the Sheriff's Office." *Russ v. Causey*, 732 F. Supp. 2d 589, 609 (E.D.N.C. 2010). And "under North Carolina law, a plaintiff may not recover punitive damages against a governmental entity." *Id.*; *see also Long v. City of Charlotte*, 306 N.C. 187, 207, 293 S.E.2d 101, 114 (1982) (holding that "no punitive damages are allowed against a municipal corporation unless expressly authorized by statute"); *Staley v. Lingerfelt*, 134 N.C. App. 294, 299, 517 S.E.2d 392, 396 (1999) (concluding that "punitive damages may not be awarded against either a municipality or a municipal officer acting in his official capacity because suing an officer in his official capacity has the effect of suing the municipality itself"); *Houpe v. City of Statesville*, 128 N.C. App. 334, 351, 497 S.E.2d 82, 93 (1998) (dismissing claim for punitive damages against sheriff sued in official capacity only); *Biggs v. Meadows*, 66 F.3d 56, 61 (4th Cir. 1995) (noting that "punitive damages" are "unavailable in official capacity suits"); *Crain v. Butler*, 419 F. Supp. 2d 785, 794 (E.D.N.C. 2005). Plaintiff may not recover punitive damages against Defendant Wilkins because she only sued him in his official capacity.

In sum, the court grants in part and denies in part Defendants' motion, in that (1) all claims against the RCSO are dismissed, (2) the excessive force claim against Defendant Gist may proceed, (3) the *Monell* claims against Defendant Wilkins are dismissed, (4) the state law claims

---

[6] This court adheres to the principle of party presentation, meaning that it will "address only the issues raised by the parties." *Short v. Hartman*, 87 F.4th 593, 604 (4th Cir. 2023). That said, once "an issue . . . is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." *Id.* (citing *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991)).

against Defendant Wilkins may proceed, and (5) punitive damages remain available from Defendant Gist but not Defendant Wilkins.

### b. Defendants Page and Jones' Motion

#### i. Conditions of Confinement

Defendants first contend that Plaintiff fails to state an Eighth Amendment claim pertaining to Hunt's conditions of confinement. DE 60 at 7-9. To review those allegations, Defendant Page reported for duty on the morning of March 10, and shortly thereafter observed Hunt place his fingers in his throat to induce vomiting twice. DE 56 at 6. Hunt's cell had the odor of vomit and feces, so Defendant Page took Hunt to the showers so he could get cleaned up, gave Hunt a new jumpsuit, and moved him to a different booking cell. *Id.*

Later that afternoon, Defendant Page delivered Hunt his dinner, saw him in his cell covered in vomit and blood, but left him in there. *Id.* at 7. Defendant Jones never properly checked on Hunt, and Hunt died sometime between 5:19 and 6:19 p.m. *See id.* at 8, 10. As a result, the court can infer that Hunt was left in his cell, along with his vomit and blood, for somewhere between 45 minutes and 12 hours.[7] The condition of the cell, *not* the condition of Hunt, is the focus of this claim.

The Eighth Amendment "does not mandate comfortable prisons," *Rhodes*, 452 U.S. at 349, but it does require "humane conditions of confinement," *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). To state a claim targeting a prisoner's conditions of confinement, the plaintiff must allege

---

[7] The court sets this timeframe by reasoning that Hunt vomited on himself sometime between 6:30 a.m. and 4:30 p.m. on March 10. As noted, when Defendant Page first saw Hunt induce vomiting (around 6:00 a.m.), he helped Hunt get cleaned up, gave him a new jumpsuit, and moved him to a different cell. DE 56 at 6. Even if Hunt had immediately induced vomiting again (which the Second Amended Complaint does not allege, but which the court could reasonably infer based on the allegation that he had been vomiting repeatedly in the preceding days, *id.* at 4), that means that Hunt would have been exposed to his own bodily fluids in the booking cell for less than 12 hours, given his likely time of death. *Id.* at 10. And if Hunt did not vomit again until approximately 4:30 p.m. (just before Defendant Page dropped off his dinner and observed Hunt covered in vomit), and had died by 5:19 p.m., then he would have been exposed to his own fluids in the cell for roughly 45 minutes.

28

both an objective and subjective component. First, the conditions of confinement must be "sufficiently serious," *Wilson*, 501 U.S. at 298, meaning that they "pos[e] a substantial risk of serious harm" to the prisoner, *Farmer* 511 U.S. at 834. Second, the plaintiff must allege facts supporting that the prison officials were "deliberate[ly] indifferen[t]" to the risk, *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016), i.e., that they "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety," *Farmer* 511 U.S. at 837.

The court finds that Hunt's exposure to his own vomit and blood for possibly as short a period as 45 minutes, but no more than 12 hours, fails to meet the objective prong of a conditions of confinement claim. As the Supreme Court has explained, "the duration of the confinement" is crucial to assessing its constitutionality. *Hutto v. Finney*, 437 U.S. 678, 685 (1978). "A filthy, overcrowded cell . . . might be tolerable for *a few days* and intolerably cruel for weeks or months." *Id.* at 686–87 (emphasis added). Judged against that standard, courts in this circuit and elsewhere have routinely concluded that comparable (or worse) conditions endured for longer periods than that endured by Hunt did not rise to the level of constitutional significance. *See Beverati v. Smith*, 120 F.3d 500, 504 (4th Cir. 1997) (rejecting prisoners' due process claim and finding that six months in administrative segregation cell that was "infested with vermin" and "smeared with human feces and urine" were not conditions "so atypical that exposure to them . . . imposed a significant hardship in relation to the ordinary incidents of prison life"); *Nickens v. Duffield Reg'l Jail Auth.*, No. 7:23-CV-00418, 2023 WL 8283650, at *2 (W.D. Va. Nov. 30, 2023) (prisoner's "allegation that he lived in a cell with smeared feces for four days, while unpleasant, is not severe enough to state a conditions of confinement claim"); *Wagner v. Warden*, No. 14-CV-791, 2015 WL 1276749, at *41 (D. Md. Mar. 19, 2015) (several days "in a cold cell without a mattress, toiletries, or running water" and where there were "feces and urine on the floor" did not suffice

"to state an Eighth Amendment claim for unconstitutional conditions of confinement"); *Harris v. Fleming*, 839 F.2d 1232, 1234-35 (7th Cir. 1988) (several days "in a filthy, roach-infested cell" without "soap, toothbrush, [] toothpaste," or "toilet paper" did not "reach unconstitutional proportions").

In short, "[l]imited periods of incarceration in unsanitary conditions are [] insufficient to evidence an Eighth Amendment violation." *Whiting v. Owens*, No. 5:14-CV-0104, 2014 WL 2769027, at *3 (M.D. Ga. June 18, 2014) (finding that dayslong confinement "in a cell with a broken toilet . . . may have been unpleasant times," but "simply d[id] not describe the sort of extreme deprivation that an Eighth Amendment claim demands") (internal quotation marks omitted). The court thus finds that Hunt's (no more than) 12 hours in a cell with his own bodily fluids, "while unpleasant, is not severe enough to state a conditions of confinement claim." *Arrington v. Collins*, No. 7:23-CV-00210, 2023 WL 7005828, at *2 (W.D. Va. Oct. 24, 2023). That temporary exposure does not amount to a "sufficiently serious" condition of confinement to state a cognizable Eighth Amendment claim. *Wilson*, 501 U.S. at 298

Plaintiff's conditions of confinement claim is also subject to dismissal because the Second Amended Complaint does not contain any factual matter supporting that Hunt's temporary exposure to his own vomit and blood "pos[ed] a substantial risk of serious harm" to him. *Farmer* 511 U.S. at 834. "[T]he mere smell or presence of human waste is not sufficiently serious to constitute a violation of the Eighth Amendment." *Salmons v. W. Reg'l Jail Auth.*, No. 3:18-CV-1447, 2019 WL 5616916, at *6 (S.D.W. Va. Oct. 30, 2019). And "[i]f a prisoner has not suffered serious or significant physical or mental injury *as a result of the challenged condition*, he simply has not been subjected to cruel and unusual punishment within the meaning of the [Eighth] Amendment." *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir. 1993) (emphasis added).

30

In other words, "[b]ecause an injury is essential to an Eighth Amendment claim, courts will dismiss claims challenging conditions of confinement that do not allege an injury." *Cloninger v. Harvey*, No. 3:20-CV-0170, 2020 WL 2559949, at *6 (S.D.W. Va. May 20, 2020) (collecting cases); *see also Smith v. Copeland*, 87 F.3d 265, 268 (8th Cir. 1996) (rejecting prisoner's claim that several days where toilet overflowed with raw sewage amounted to unconstitutional condition of confinement because prisoner "did not allege that he was exposed to disease or suffered any other consequences of the exposure"); *Williams v. O'Brien*, No. 1:12-CV-174, 2014 WL 2864897, at *11 (N.D.W. Va. June 24, 2014) (holding that "[d]iscomfort" caused by unsanitary cell that "last[ed] just a few days [and did] not result in any notable harm cannot form the basis for a constitutional claim"); *Powell v. Fed. Bureau of Prisons*, No. 1:08-CV-00199, 2009 WL 3160124, at *1, *4 (S.D.W. Va. Sept. 25, 2009) (dismissing Eighth Amendment claim where prisoner's cell was "saturated with the fumes of feces, the smell of urine and vomit as well as other stale bodily odors" because prisoner "fail[ed] to allege significant physical or emotional injury resulting from the challenged conditions"). Plaintiff here has not alleged that Hunt's conditions of confinement (that is, Hunt's time in a cell with his own vomit and blood, *not* whatever medical condition caused him to vomit blood) caused him physical or emotional injury. *See* DE 56 at 13 (contending in conclusory fashion that, because Defendants Page and Jones left Hunt "isolated in a booking cell in unsanitary conditions," they "are liable for [his] death"). Without an allegation of "serious or significant physical or mental injury" that was "a result of" the conditions of Hunt's cell, those conditions do not constitute "cruel and unusual punishment within the meaning of the [Eighth] Amendment." *Strickler*, 989 F.2d at 1381.

Because the Second Amended Complaint does not plausibly allege the objective component of a conditions of confinement claim, the court will dismiss that claim and does not reach its subjective component. Defendants' motion to dismiss is granted in part as to that claim.

### ii. Deliberate Indifference

Defendants also move to dismiss Plaintiff's deliberate indifference claim. DE 60 at 9-13. Relevant to that claim, when Defendant Page reported to the RCDC on the morning of March 10, other officers told him that Hunt "had vomited numerous times during the previous night," and "medical staff told him [that Hunt] had continuously vomited for the past 3 days and had been in medical observation for heroin use." DE 56 at 6. Defendant Page also observed Hunt induce vomiting twice in the morning, and saw Hunt covered in vomit and blood in his cell, and in a feeble state, in the early evening. *Id.* at 6-7. In addition, Defendant Page told Defendant Jones that Hunt "had been vomiting . . . all day," but that he thought Hunt was faking it. *Id.* at 8. Defendants Page and Jones failed to conduct proper checks of Hunt's cell throughout the day on March 10. *Id.* at 7-9.

A prison official's "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal citation and quotation marks omitted). "Prisoners alleging that" their serious medical needs have been met with deliberate indifference "must satisfy the Supreme Court's two-pronged test set forth in *Farmer*." *Scinto*, 841 F.3d at 225. First, the medical condition must be objectively "serious," *Farmer*, 511 U.S. at 835, meaning that the condition either "has been diagnosed by a physician as mandating treatment" or is one "that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention," *Iko*, 535 F.3d at 241 (citing *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir.1999)). Second, the

prison official must act with a "sufficiently culpable state of mind," *Farmer*, 511 U.S. at 834, which in the medical care context entails "subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction," *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014).

Turning first to Defendant Page, the court finds that Plaintiff has plausibly stated a claim for deliberate indifference against him. The Second Amended Complaint alleges that Defendant Page knew Hunt had been vomiting for days and, early on the evening of March 10, observed a weakened Hunt in his cell covered in vomit and blood. DE 56 at 6-7. Taking those allegations as true, Defendant Page therefore knew that Hunt was suffering from an objectively serious medical condition; "throwing up vomit and blood . . . is the sort of serious medical condition so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Scinto*, 841 F.3d at 232; *accord Quintana v. Santa Fe Cnty. Bd. of Commissioners*, 973 F.3d 1022, 1030 (10th Cir. 2020) ("the seriousness of the medical risks associated with vomiting blood would be obvious to any reasonable observer"); *see also Jamison v. Clarke*, No. 7:18-CV-00504, 2021 WL 969201, at *8 (W.D. Va. Mar. 15, 2021) (concluding that "vomiting blood" constitutes objectively serious medical need); *cf. Sylvester v. City of Newark*, 120 F. App'x 419, 423 (3d Cir. 2005) (finding, for pretrial detainee's claim based on the Due Process Clause of the Fourteenth Amendment, that "acute withdrawal with excessive vomiting" constituted "a serious medical need").

The Second Amended Complaint also plausibly alleges that Defendant Page responded to Hunt's serious medical condition with a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834. Defendant Page observed Hunt covered in vomit and blood, but just dropped off Hunt's dinner tray, closed the door, and did not seek assistance for Hunt or report his status to anyone.

33

DE 56 at 7. Those allegations permit the inference that Defendant Page consciously disregarded a substantial risk of harm to Hunt, whose condition had worsened over the course of the day.

Earlier on March 10, Defendant Page observed Hunt vomit, but there is no suggestion that Hunt vomited blood at that time. *See* DE 56 at 6-7. And Hunt was able to walk to the showers to get cleaned up and relocate to another cell. *Id.* By the evening, Hunt was vomiting blood and in a feeble state. *See id.* at 8. Thus, the factual allegations permit the inference that Defendant Page not only knew that Hunt was suffering from an objectively serious condition, but that Hunt's condition had noticeably deteriorated over the course of the day. By doing nothing in response to Hunt's worsening state, Defendant Page must have "recognized that his actions were inappropriate in light of that risk." *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (internal quotation mark omitted).

As the Supreme Court explained nearly 50 years ago, when a prison guard "intentionally den[ies] . . . access to medical care" for a prisoner's "serious medical needs," he acts with "deliberate indifference." *Estelle*, 429 U.S. at 104–05. Put another way, Hunt's "outward signs of [a] need for medical attention" coupled with Defendant Page's "contemporaneous failure to offer aid give rise to an inference" that Defendant Page acted with "deliberate indifference." *Scinto*, 841 F.3d at 232. Plaintiff has plausibly stated a deliberate indifference claim against Defendant Page.

Although a closer call, the court finds (after taking the allegations in the light most favorable to Plaintiff) that Plaintiff has also stated a claim for deliberate indifference against Defendant Jones. When Defendant Jones reported to work on the evening of March 10, Defendant Page told him that Hunt "had been vomiting . . . all day," but that Defendant Page thought Hunt was faking it. DE 56 at 8. There is no allegation that Defendant Jones knew Hunt had been

34

vomiting *blood*, *see* DE 56 at 8, but "vomiting continuously for a long period of time" likely "amount[s] to an objectively serious medical condition." *Gayton v. McCoy*, 593 F.3d 610, 621 (7th Cir. 2010) (distinguishing "[v]omiting, in and of itself," from "vomiting continuously for a long period of time"); *compare also Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005) (concluding that "severe heartburn and frequent vomiting" was objectively serious medical condition), *with Estate of Cheney ex rel. Cheney v. Collier*, 560 F. App'x 271, 274 (5th Cir. 2014) (finding that apparent flu-like symptoms with "one or two instances of vomiting" were not enough to put prison staff on notice of substantial risk of serious harm).

Additionally, the court can plausibly infer at this stage that Defendant Jones knew Hunt was suffering from opioid withdrawal: jail records reflected that Hunt had a history of heroin abuse and the Second Amended Complaint alleges that Defendant Jones was aware of the contents of those records. DE 56 at 4, 14 ("the jail records [] were known to Defendants Page and Jones"). Coupled with Defendant Jones' knowledge that Hunt had been vomiting all day, the court can infer that Defendant Jones' knew Hunt was suffering from opioid withdrawal, a serious medical need. *See Sylvester*, 120 F. App'x at 423; *see also Idyle v. N. Carolina Dep't of Correction Med. Dep't*, No. 5:12-CT-3190, 2014 WL 414285, at *3 (E.D.N.C. Feb. 4, 2014) (collecting cases and finding that "courts have found withdrawal symptoms to qualify as a serious medical need"); *Kelley v. Cnty. of Wayne*, 325 F. Supp. 2d 788, 790 (E.D. Mich. 2004) ("a person undergoing withdrawal can be nauseated and vomit").

The Second Amended Complaint also plausibly alleges that Defendant Jones responded to Hunt's serious medical condition with deliberate indifference because, armed with the knowledge that Hunt (1) had a history of heroin abuse and (2) had been vomiting all day, Defendant Jones did not check on Hunt to ascertain his status even though he "assigned himself to cell check duty in

35

the booking area." DE 56 at 8. Instead, he scanned the outside of Hunt's cell "with a handheld scanner . . . but failed to look [inside]." *Id.* At the motion to dismiss stage, the allegation that a prison official completely "fail[ed] to monitor and treat" a prisoner's "withdrawal symptoms" satisfies the subjective component of a deliberate indifference claim. *Idyle*, 2014 WL 414285, at *3.

The fact that Defendant Jones never physically observed Hunt and his condition is of no moment; "a prison official cannot hide behind an excuse that he was unaware of a risk" when that risk was "obvious." *Brice v. Virginia Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995); *see also Farmer*, 511 U.S. at 843 n.8 (explaining that prison official cannot "escape liability . . . [by] merely refus[ing] to verify underlying facts that he strongly suspected to be true, or declin[ing] to confirm inferences of risk that he strongly suspected to exist."). Therefore, like with Defendant Page, Hunt's "outward signs of [a] need for medical attention" and Defendant Jones' "contemporaneous failure to offer aid give rise to an inference" that Defendant Jones acted with "deliberate indifference." *Scinto*, 841 F.3d at 232. Plaintiff has plausibly stated a deliberate indifference claim against Defendant Jones.

### iii. Qualified Immunity

Defendants further assert that, even if they subjected Hunt to a constitutional violation, they are entitled to qualified immunity. DE 60 at 13-14. Not so. "A prisoner's right to adequate medical care and freedom from deliberate indifference to medical needs has been clearly established by the Supreme Court and [the Fourth] Circuit since at least 1976 and, thus, was clearly established at the time of the events in question." *Scinto*, 841 F.3d at 236. In the context of medical care claims, the Fourth Circuit has disclaimed more specific phrasing of the relevant constitutional right and reiterated that *Scinto's* "exact phrasing of the right at issue is sufficiently precise."

36

*Tarashuk v. Givens*, 53 F.4th 154, 163 (4th Cir. 2022); *see also Iko*, 535 F.3d at 243 n.12 (describing "clearly established . . . right to medical care"). Even if more precise framing of the right were necessary (and it is not), it was also clearly established in the Fourth Circuit, by March of 2021, that a prison official violates a prisoner's constitutional right to medical care by failing to obtain or provide treatment to a prisoner who is vomiting blood and/or suffering from opioid withdrawal. *See Scinto*, 841 F.3d at 236; *Tilson v. Humphrey*, No. 5:19-CV-00033, 2021 WL 4443816, at *9 (W.D. Va. Sept. 27, 2021) (holding that "it is well established that the right to be monitored and treated for withdrawal from addictive drugs falls under the protections of the Eighth Amendment"); *Gonzalez v. Cecil Cnty., Maryland*, 221 F. Supp. 2d 611, 617 (D. Md. 2002) (over twenty years ago, denying qualified immunity to nurses who failed to treat pretrial detainee suffering from heroin withdrawal). At this stage of the proceedings, Defendants have not demonstrated an entitlement to qualified immunity.

iv. <u>Wrongful Death</u>

Lastly, Defendants contend that they are entitled to public official immunity on Plaintiff's state law wrongful death claim. They are correct. Public official immunity "shield[s] public officials from tort liability" unless their conduct "was (1) outside the scope of official authority, (2) done with malice, or (3) corrupt." *Bartley v. City of High Point*, 381 N.C. 287, 294, 873 S.E.2d 525, 533 (N.C. 2022); *see also Baker v. Smith*, 224 N.C. App. 423, 434, 737 S.E.2d 144, 151 (2012) (explaining that prison guards and "assistant jailers are public officials entitled to immunity"). Relevant here, "[a] defendant acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another." *Grad v. Kaasa*, 312 N.C. 310, 313, 321 S.E.2d 888, 890

(1984).[8] "A malicious act thus has three elements: it is (1) done wantonly, (2) contrary to the actor's duty, and (3) intended to be injurious to another." *R.A. v. Johnson*, 36 F.4th 537, 545 (4th Cir. 2022) (internal quotation mark omitted).

Here, Plaintiff "has not alleged any facts as to the third element of malice: intent." *Id.* The Second Amended Complaint plausibly alleges that Defendants Page and Jones were indifferent to Hunt's serious medical needs, but "mere reckless indifference is insufficient to show a constructive intent to injure." *Knibbs v. Momphard*, 30 F.4th 200, 228 (4th Cir. 2022) (internal quotation mark omitted); *cf. Wilson v. United States*, 332 F.R.D. 505, 519 (S.D.W. Va. 2019) ("Deliberate indifference is more than mere negligence *but less than malice*.") (emphasis added). In response to Defendants' motion, Plaintiff largely restates the allegations from the Second Amended Complaint and concludes that Defendants Page and Jones "intentionally ignored Hunt's condition." DE 64 at 18. But intentionally ignoring a risk of harm is distinct from intentionally *creating* that harm: "[s]imply by alleging failure to take corrective action, [Plaintiff] has not adequately pled that [Defendants Page and Jones] constructively intended to harm [Hunt]." *R.A.*, 36 F.4th at 546.

The Second Amended Complaint also alleges in conclusory fashion that "Defendants Page and Jones' conduct" was "done intentionally, willfully, and maliciously." DE 56 at 13. But that naked conclusion "devoid of further factual enhancement" is one that the court need not credit as true. *ACA Financial*, 917 F.3d at 211. Accordingly, the court finds that Plaintiff has failed to plausibly pierce Defendants Page and Jones' public official immunity and that her state law claim against them must be dismissed.

---

[8] Plaintiff does not allege that Defendants Page and Jones were acting outside the scope of their official authority, and neither does she allege that they acted corruptly. *See State v. Hair*, 114 N.C. App. 464, 468, 442 S.E.2d 163, 165 (1994) ("A corrupt intent means a wrongful design to acquire some pecuniary profit or other advantage.") (internal quotation mark omitted).

In sum, the court grants in part and denies in part Defendants' motion, in that (1) Plaintiff's conditions of confinement claim is dismissed, (2) Plaintiff's deliberate indifference claim may proceed, and (3) Plaintiff's wrongful death claim is dismissed (as to these Defendants).

## V.  CONCLUSION

Defendants Gist, Wilkins, the RCSO, and the Surety's Motion [DE 57] is GRANTED IN PART and DENIED IN PART, and Defendants Page and Jones' Motion [DE 59] is GRANTED IN PART and DENIED IN PART, in that:

1) All claims against the RCSO are dismissed;

2) The excessive force claim against Defendant Gist shall proceed;

3) The *Monell* claims against Defendant Wilkins are dismissed;

4) The state law claims against Defendant Wilkins shall proceed;

5) Punitive damages remain available from Defendant Gist but not Defendant Wilkins;

6) The conditions of confinement claim against Defendants Page and Jones is dismissed;

7) The deliberate indifference claim against Defendants Page and Jones shall proceed; and

8) The wrongful death claim against Defendant Page and Jones is dismissed.

SO ORDERED this __10th__ day of January, 2025.

RICHARD E. MYERS II
CHIEF UNITED STATES DISTRICT JUDGE